17 F.3d 397
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Francisco Javier VALENZUELA, Defendant-Appellant.
 No. 92-50541.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 6, 1993.
Decided Feb. 24, 1994.
 
 Before: FLETCHER, PREGERSON and HALL, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Defendant Francisco Javier Valenzuela appeals on four grounds his conviction for drug trafficking crimes. We affirm the conviction because we conclude that the only error which was made, admission of the hearsay statements of a government witness, was harmless.
 
 FACTS
 
 3
 After a jury trial, defendant was convicted of violating 21 U.S.C. Sec. 846 by conspiring to distribute and possess with intent to distribute cocaine and methamphetamine, and of violating 21 U.S.C. Sec. 841(a)(1) by distributing methamphetamine. At trial, the government introduced evidence showing that on numerous occasions between August 7, 1991, and August 26, 1991, defendant met with a government informant posing as a drug dealer. At the first meeting, on August 7, 1991, the informant told defendant that he wanted to buy drugs, and defendant said that he could supply them. During the week following that first meeting, defendant and the informant met at defendant's house several times; there, defendant spoke of selling heroin, cocaine, and methamphetamine, and showed the informant heroin and cocaine samples. During the second week, defendant introduced the informant to suppliers of heroin and cocaine, and, again at his own house, showed the informant a cocaine sample.
 
 
 4
 During the third week, defendant took the informant, on four occasions, to a car body repair shop, where they met with two other men (codefendants in this case) to discuss drug sales. The parties agreed that the informant would buy 50 kilograms of cocaine and 40-45 pounds of methamphetamine. At the last meeting, the two codefendants produced for sale 21.4 kilograms of methamphetamine. All three defendants were then arrested. A search of defendant's house turned up more methamphetamine, loaded guns, and a scale.
 
 
 5
 Defendant conceded that these events took place, but contended that he had been entrapped. He testified that he had had no previous drug experience, but that in the week before the events set forth above, the government informant had seduced him with promises of wealth and an easy life if he supplemented his honest job with more lucrative employment as a drug middleman.
 
 
 6
 The government denied that this earlier contact had taken place, and produced evidence showing that on the date when the informant was supposed to have been tempting defendant by showing him a suitcase containing $1 million, the informant was actually miles away, under surveillance by the DEA case agent.
 
 
 7
 When defendant took the stand, he offered to identify passages in transcripts of his post-August 7 telephone conversations with the informant in which, he claimed, the informant instructed him to attend the drug deal and he protested that he did not want to be there. But he never identified these passages.
 
 
 8
 Defendant was convicted and sentenced to 235 months in prison and five years of supervised release. His appeal raises four issues, which we address seriatim.
 
 DISCUSSION
 1. Jury Selection
 
 9
 The government used its fifth peremptory challenge to strike prospective juror Ramirez. The court had identified Ramirez as Hispanic, and had indicated that only one other person on the venire was possibly Hispanic. Defendant objected to the challenge on the grounds that it was based on racially discriminatory criteria and violated his right to equal protection under Batson v. Kentucky, 476 U.S. 79 (1986).
 
 
 10
 At the court's request, the prosecutor defended the challenge, stating that Ramirez had been arrested, and that from the start, he, the prosecutor, had been striking people whose family members had been convicted. The prosecutor also noted that Ramirez had been a member of a hung jury.
 
 
 11
 The record reveals that the government had exercised its previous four strikes against prospective jurors whose family members had been convicted. The record also reveals that Ramirez himself had been neither arrested or convicted, but that his son had been arrested for drunk driving and speeding. This discrepancy between the record and the prosecutor's stated reason for his challenge was pointed out to the court and the prosecutor; the prosecutor replied that for his purposes there was no difference between a juror's conviction and the arrest of a juror's family member. Following this explanation, the court ruled that the prosecutor had stated a legitimate nonracial reason for his challenge.
 
 
 12
 We review a trial court's findings regarding purposeful discrimination in the jury selection process for clear error. United States v. DeGross, 960 F.2d 1433, 1442 (9th Cir.1992) (en banc). The burden of proof in a Batson challenge rests initially on the party who objects to the peremptory challenge; that party must make out a prima facie case by showing facts and circumstances from which an inference of racial discrimination may be drawn. Batson, 476 U.S. at 96. The burden then shifts to the opposing party to articulate a nondiscriminatory reason for the challenge. Finally, the court must "determine if the [party objecting to the challenge] has established purposeful discrimination." Id. at 98; United States v. Bishop, 959 F.2d 820, 824 (9th Cir.1992). Where the trial court does not rule on the question of whether the party raising the objection has established a prima facie case, but simply requires the other party to offer a race-neutral explanation, "the preliminary issue of whether the defendant has made a prima facie showing becomes moot." Hernandez v. New York, 111 S.Ct. 1859, 1866 (1991); Bishop, 959 F.2d at 824.
 
 
 13
 We conclude that the trial court did not err in finding that the government provided credible, race-neutral explanations for dismissing Ramirez. Challenges based on a family member's negative experiences with law enforcement have been upheld under Batson. United States v. Vaccaro, 816 F.2d 443, 457 (9th Cir.1987), certs. denied, 484 U.S. 914 (1987), 484 U.S. 928 (1987). A particularly strong case is presented here, where the prosecutor had established a pattern of striking non-Hispanic venirepersons for that very reason.
 
 
 14
 Defendant makes much of the fact that the prosecutor initially said that Ramirez himself had been convicted, and that this was not true. The trial judge, however, apparently interpreted this as a simple mistake, and defendant provides no reason why this court should not defer to that interpretation. Moreover, since the trial court's ruling on this point involves questions of motive and intent, there is every reason that this court should defer, absent some showing of discrimination on the record.[1]
 
 
 15
 Defendant also points out that Ramirez said only that his son had been arrested, not convicted. This is a distinction without a difference: although the prosecutor had exercised all of his prior strikes against prospective jurors whose family members had been convicted, he explained that his method was to proceed "from the [most] egregious to the least egregious." Tr. of April 28, 1992 at 117. The order of his strikes bears this out, and supports the theory that by the time he got to his fifth strike, he was ready to deal with the "less egregious" situation of a venireperson whose son had been arrested.
 
 
 16
 Defendant argues that despite the prosecutor's facially race-neutral explanations, the challenge was unconstitutional because it was "generic, stereotypical, [and] group-based." Appellant's Brief at 19. Defendant cites Bishop, in which this court reversed a conviction where the prosecutor's explanation for striking a black prospective juror was that the juror lived in a poor, predominantly black neighborhood, and hence was likely to think that the police "pick on black people." 959 F.2d at 822. The court concluded that this socio-geographic criterion for exclusion was little more than a proxy for race, and hence was impermissible. Id. at 826.
 
 
 17
 Here, however, there is no contention that the arrest of a family member is a proxy for ethnicity; hence the logic of Bishop does not apply. Defendant takes out of context the Bishop court's disapproval of "generic reasons [and] group-based presuppositions." 959 F.2d at 825. To some extent, almost any peremptory challenge will be based on generalizations, since trial counsel have little opportunity to become acquainted with venirepersons as individuals. It is only when a generic reason or presupposition cloaks discrimination against a protected group that it is impermissible.
 
 
 18
 Defendant also argues that the trial court erred by failing to probe further into the government's reasons for excluding Ramirez, and suggests that the court should have conducted "an adversary hearing," possibly even one which would have allowed examination and cross-examination of witnesses. The law of this circuit, however, does not require such a proceeding. See United States v. Alcantar, 832 F.2d 1175, 1180 (9th Cir.1987); United States v. Thompson, 827 F.2d 1254 (9th Cir.1987) (holding only that, under most circumstances, the government must justify its challenges in a forum which permits defendant to hear and respond, rather than in an ex parte proceeding).
 
 
 19
 Finally, defendant suggests that regardless of the forum, he was denied the opportunity to rebut the prosecutor's explanation because the district court made its ruling without asking for rebuttal by defense counsel. At trial, however, counsel neither objected to the trial court's method of proceeding nor indicated what his rebuttal might have been. Save for the failed Bishop argument discussed above, defendant has provided no rebuttal on appeal either. Thus if the trial court's procedures were defective, no error resulted. Procedurally as well as substantively, defendant's Batson argument fails.
 
 
 20
 2. The "Speaking Objection"
 
 
 21
 On the first day of trial, the court told counsel in chambers that they should not make speeches or "speaking objections" in front of the jury, but should simply state the fact of an objection and the legal reason for it. At the end of defendant's opening statement, which contained many references to entrapment, the following colloquy took place:
 
 
 22
 [Prosecutor]: Your Honor, we objected in the entrapment defense. We asked for notice of that defense months and months ago.
 
 
 23
 The Court: Let's take up legal disputes outside the presence of the jury.
 
 
 24
 Tr. of April 28, 1992 at 132. Defense counsel objected to the prosecutor's remark, stating that it was without foundation, and that it "ha[d] the effect of making the defense look sneaky and untrustworthy." Tr. of April 29, 1992 at 4. On that basis, defendant moved for a mistrial.
 
 
 25
 The court denied the motion, but offered to instruct the jury to disregard the prosecutor's statement. Defendant declined the offer, agreeing with the judge that an instruction would simply call attention to the statement.
 
 
 26
 The denial of a motion for a mistrial based on improper prosecutorial remarks is reviewed for abuse of discretion. United States v. Monks, 774 F.2d 945, 954-55 (9th Cir.1985); United States v. Charmley, 764 F.2d 675, 677 & n. 1 (9th Cir.1985). The reviewing court determines whether it was more probable than not that the improper remarks materially affected the fairness of the trial. United States v. Polizzi, 801 F.2d 1543, 1558 (9th Cir.1986).
 
 
 27
 We affirm the district court's ruling. The prosecutor's "speaking objection" was limited to a single remark; it was brief; and it was aimed at the defense rather than at defendant personally. It was followed by an admonishment from the court; moreover, the court stated both before jury selection and at the close of evidence that the arguments of the lawyers are not evidence. Given this context, as well as the nature of the remark, the trial court found that the objection had not done any real harm. The record does not indicate otherwise.
 
 
 28
 The trial court's conclusion was if anything strengthened by subsequent events: defendant was allowed to put on evidence relating to entrapment, and the court gave the jury an entrapment instruction. If, as counsel feared, the jury might have drawn the conclusion from the prosecutor's comment that the defense was "sneakily" trying to gain an unfair advantage, the defense must have been at least partially vindicated when the judge allowed it to do precisely what the prosecutor's remark suggested it was improper to do.
 
 
 29
 Defendant also complains of purportedly overzealous remarks made by the prosecutor during closing. Defendant's argument is that even if the prosecutor's speaking objection was not sufficiently damaging to warrant a mistrial at the time it was made, later events rendered it so.
 
 
 30
 Because defendant did not renew the mistrial motion after closing arguments, we review this portion of defendant's challenge for plain error. United States v. Dischner, 974 F.2d 1502, 1515 (9th Cir.1992), cert. denied, 113 S.Ct. 1290 (1993); Fed.R.Crim.P. 52(b).
 
 
 31
 Defendant has not established plain error. He complains that the prosecutor stated that the defense had "twisted" and "played fast and loose" with the facts, and had "fabricated" an entrapment defense. The government's accusation of factual inaccuracies, however, was supported by references to an apparent change of position regarding the amount of money the informant had allegedly used to beguile defendant (from $200,000 to $1,000,000). The government's accusation of "fabrication" was supported by references to the government's rebuttal, which had seriously damaged defendant's testimony that the informant had been with him in his home on August 5, 1992, orchestrating his downfall.
 
 
 32
 These references in the government's closing statement show that the government's accusations were not groundless. In addition, they reveal that the jury was given an opportunity to test those accusations against evidence which it had seen and heard. Under these circumstances, and in light of the repeated instruction that arguments are not evidence, the district court's failure to declare a mistrial on the basis of remarks made by the government during closing was not plain error.
 
 3. Admission of the Scale
 
 33
 After the DEA case agent had testified for the government, he was called as a witness for the defense. The agent was questioned about the results of the search of defendant's house--which the agent had not witnessed. The agent agreed with defense counsel that the search had not turned up records, ledgers, computer discs, bank statements, jewelry, or laboratory equipment, although all of those items are generally searched for in narcotics investigations. The prosecutor, on cross-examination, then asked the agent if bags and vials of methamphetamine, two guns, and a scale had been found; the agent responded that they had. The agent was shown a black case, and asked if it contained a scale which had been turned over to him by the officers who had searched defendant's house. He answered that it did, and the scale was admitted into evidence. When defendant objected to its admission, the court stated that "the probabilities are that it was found at the location, so I will admit it." Tr. of May 12, 1992 at 15.
 
 
 34
 Defendant argues that the scale should not have been admitted because the agent had no personal knowledge of its seizure, and the government had failed to lay a foundation which would establish its relevance. Defendant also argues that the government failed to establish a chain of custody for the scale. Defendant does not argue, however, that the government's questions about the scale (or the methamphetamine and the guns) were improper. Such an argument, if made, would fail: if the district court erred by allowing the government to question the agent about the search, that error was invited by defense counsel, who had previously engaged in similar questioning.
 
 
 35
 But once the agent's statement that a scale had been found at defendant's house was in evidence, the admission of the scale itself, if error, was harmless. The scale itself added little to the agent's testimony, since at trial defendant did not contest that a scale was in fact found.[2] Admission of the scale thus does not furnish a basis for reversal.
 
 4. Hearsay Statements
 
 36
 On cross-examination, defense counsel repeatedly asked the informant whether he had had contact with defendant between August 1 and August 7, 1991--the period in which, according to defendant, the trap was laid. The informant denied any such contact. Defense counsel also asked questions suggesting that the informant had come to the United States from Cuba during the Mariel boat lift; that he had been in a mental institution in Cuba; that he had been diagnosed as suffering from a "severe psychiatric disorder" by a doctor in this country; and that he practiced a religion whose adherents believed they got special knowledge from God. In addition, defense counsel got the informant to admit that he had received money and other favorable treatment (such as a plea bargain and suspension of deportation) in exchange for his work, and that he had to keep the police and prosecutors happy with him.
 
 
 37
 On redirect examination, the government probed the circumstances of the informant's August 7 meeting with defendant. The following exchange took place:
 
 
 38
 Q. Did you have any contact with defendant Valenzuela before August 7th of 1991?
 
 
 39
 A. Never.
 
 
 40
 Q. You started to mention a person that introduced you to defendant Valenzuela on August 7th.
 
 
 41
 A. Yes, sir.
 
 
 42
 Q. Who introduced you to defendant Valenzuela?
 
 
 43
 A. A gentleman by the name of Jose.
 
 
 44
 Q. Where did you meet Jose?
 
 
 45
 A. At a friend's house.
 
 
 46
 Tr. of May 6, 1992 at 53. After defense counsel made an objection to questions beyond the scope of cross-examination--which was overruled--the questioning resumed.
 
 
 47
 Q. Did you tell this Jose man that you were working for the DEA?
 
 
 48
 A. No, sir.
 
 
 49
 Q. And how did Jose introduce you to defendant Valenzuela?
 
 
 50
 A. He took me to his house.
 
 
 51
 Q. Why?
 
 
 52
 A. Because I had spoken to my friend and asked him about Jose. Because I saw that he was addicted to drugs. So I asked him if he knew some people who sold drugs and he told me he did.
 
 
 53
 Q. And then what did he do?
 
 
 54
 [Defense counsel]: Objection, motion to strike. The answer is a hearsay response, what somebody else told him.
 
 
 55
 The Court: Overruled.
 
 
 56
 A. This is Mr. Jose, told me he had somebody who sold drugs, and took me to Mr. Valenzuela's house.
 
 
 57
 Id. at 54. On appeal, defendant challenges the district court's admission of the last two responses. We review the admission of evidence over a hearsay objection for abuse of discretion. United States v. Dean, 980 F.2d 1286, 1288 (9th Cir.1992).
 
 
 58
 The government argues that the statements were not hearsay because they were not introduced for the truth of the matter asserted. The government relies first on United States v. Echeverry, 759 F.2d 1451 (9th Cir.1985). In that case, a DEA agent testified that defendant had been targeted as a drug dealer by prior intelligence; the court held that this testimony was admissible because it was offered not for the truth of the matter asserted, but rather "as necessary background information under Rule 801(c)." 759 F.2d at 1457.
 
 
 59
 Echeverry is not controlling in this context, however, given this court's later rulings in United States v. Makhlouta, 790 F.2d 1400, 1402 (9th Cir.1986), and United States v. Dean, 980 F.2d at 1288-89. In Makhlouta, where, as here, the defendant raised a defense of entrapment, the government introduced evidence showing that the FBI had targeted defendant because an FBI agent had been told by an informant that the defendant was looking for a cocaine buyer. The court held that the testimony was not properly admissible to show the agent's state of mind, because "under the law of entrapment, 'it is not the state of mind of the government agent that is important; ... it is the predisposition of the defendant to commit the offense ... that counts.' " 790 F.2d at 1402 (quoting United States v. McClain, 531 F.2d 431, 435 (9th Cir.1976), cert. denied, 429 U.S. 835 (1976) (other internal citations omitted)).[3] The court then concluded that the disputed evidence was simply not relevant, 790 F.2d at 1402, despite the fact that it might have furnished illuminating "background."
 
 
 60
 Very recently, this court applied Makhlouta in Dean, where, once again, a government agent testified about the reason he had targeted defendant for investigation. Again, that testimony was held to be irrelevant. 980 F.2d at 1288.
 
 
 61
 The defendant in Dean was convicted of possession of a firearm by a felon, in violation of 18 U.S.C. Sec. 922(g)(1). At trial, a deputy sheriff testified that he had gone to defendant's mobile home to investigate because he had been told by a third person that defendant had extorted money from him by discharging a gun near his ear. The court held that, as in Makhlouta, the out-of-court statements were probative of the deputy's reasons for commencing the investigation, but that those reasons had no connection to any element of the crime charged, and were in that sense not relevant. 980 F.2d at 1288. The court went on to explain that apart from the deputy's state of mind, the statements were probative of an element of the crime--possession of the gun. But while they were relevant in this sense, they were also inadmissible, because they were hearsay.
 
 
 62
 The same analysis applies here. If the challenged statements were not admitted for some relevant non-hearsay purpose, they were relevant to show that defendant was predisposed to sell drugs--which, as the district court instructed the jury, would defeat an entrapment defense. Instr. # 43. But as such, they were out-of-court statements introduced to prove the truth of the matter asserted (defendant sold drugs). Without some other basis for admission, they are inadmissible hearsay.
 
 
 63
 The government contends that there was another basis for admission. It argues that this case is different from Makhlouta and Dean because here the informant's state of mind was relevant: defendant had strongly suggested on cross-examination that the informant was mentally unstable, that he thought he was getting special knowledge from God, and that he was driven by a desire to keep the government happy, and by so doing to keep his financial and legal affairs in order.
 
 
 64
 We reject this argument. Defendant's questions about the informant's religious beliefs and mental instability were clearly intended to impeach the informant's credibility. But showing or attempting to show that the informant was not believable is not the same as making his state of mind relevant to the entrapment defense (which under the law of this circuit it clearly is not). The government is confusing state of mind with credibility: if it were true that state of mind is put at issue every time credibility is attacked, the hearsay rule would largely be eviscerated.
 
 
 65
 Neither do we accept the government's contention that defendant put the informant's motives at issue, and that the challenged statements were therefore relevant to rehabilitate him on that score. The out-of-court statements are simply not probative of motive: nothing in the record indicates that the informant would have made his superiors any less happy by creating and capturing new drug criminals than by delivering confirmed ones to the government. Indeed, defendant's theory was that the government was very much behind the temptation of an innocent man.
 
 
 66
 Thus the government's ostensible reasons for introducing the out-of-court statements do not withstand scrutiny. The statements were hearsay, and should have been excluded or stricken.
 
 
 67
 Nevertheless, we uphold the conviction because the district court's error was harmless beyond a reasonable doubt. United States v. Rubio-Villareal, 967 F.2d 294, 296, n. 3 (9th Cir.1992) (en banc). Within a very short time after his purported initiation into the world of drugs, defendant was hooked into a complicated network of suppliers of three different kinds of drugs, and was able to assist the informant in purchasing, or at any rate setting up deals to purchase, very large quantities of cocaine and methamphetamine. Circumstantial evidence further indicated that defendant was no novice: in phone conversations with the informant, transcripts of which were provided to the jury, defendant referred to drugs by code names. And a search of his house had turned up more drugs, firearms and a scale.[4]
 
 
 68
 Moreover, defendant suffered serious setbacks in his own presentation of his entrapment defense: he promised to cite instances in which the informant issued instructions for the drug sale and in which he, the defendant, expressed his reluctance to go along--and then he never made good on that promise. Even more damaging, the government was able to rebut defendant's testimony about the crucial events of August 5 with the case agent's testimony that the informant had been otherwise engaged on that day.
 
 
 69
 The serious infirmities in defendant's presentation, together with the weighty non-hearsay evidence of predisposition which was marshalled by the government, lead us to conclude that the trial court's erroneous admission of the hearsay statement was harmless beyond a reasonable doubt.
 
 
 70
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Defendant also suggests that the strike was discriminatory because it was made even after Ramirez had stated that he could serve fairly. We reject this argument. In two previous instances, the prosecutor had struck non-Hispanic venirepersons even though they had stated that they were not biased as a result of the experiences of family members with law enforcement. Seen within this pattern, the fact that the prosecutor struck Ramirez despite his assurance of impartiality does not prove discriminatory intent
 
 
 [2]
 Instead, defense counsel argued in closing that the scale may have belonged to someone in the house other than defendant, or may have been used for some innocent purpose
 
 
 [3]
 In addition to holding that the challenged statement was not relevant, the Makhlouta court also held that it was not hearsay, since it was not introduced for the truth of the matter asserted. 790 F.2d at 1402
 
 
 [4]
 Defendant did attempt to refute some of this evidence: he explained that the guns found in his house belonged to housemates, or were necessary for scaring away seagulls in his job at the pig company; as for the code words used in the recorded conversations, defendant said they were taught to him by the informant. Tr. of May 12, 1992 at 60